568 So.2d 896 (1990)
Rolando GARCIA, Appellant,
v.
STATE of Florida, Appellee.
No. 73648.
Supreme Court of Florida.
September 6, 1990.
Rehearing Denied November 9, 1990.
Geoffrey C. Fleck of Friend, Fleck & Gettis, Sp. Asst. Public Defender, South Miami, for appellant.
Robert A. Butterworth, Atty. Gen., and Ralph Barreira, Asst. Atty. Gen., Miami, for appellee.
BARKETT, Justice.
Rolando Garcia ("Garcia") appeals his convictions of four counts of first-degree murder and related charges, and his four sentences of death. We reverse the convictions, vacate the sentences of death, and remand for new trials once the charges are properly severed as instructed in this opinion.[1]
The state charged Garcia in a twenty-four-count indictment with eight counts of first-degree murder and sixteen related offenses. The counts related to four episodes of double murders that occurred in Dade County:
(1) Mario Amador and Robert Alfonso, on Jan. 22, 1986;
(2) Luis Robledo and Ulipano Ledo, on Feb. 27, 1986;
(3) Ramon Alvaro and Daisy Ricard, on Apr. 23, 1986;
(4) Sara Musa and Fara Quintero, on Apr. 22, 1986.[2]
*897 After two mistrials and a severance of the defendant with whom Garcia was indicted,[3] Garcia timely moved to sever the offenses. The trial court severed the five counts related to the Musa and Quintero murders,[4] but it kept the other nineteen counts together for trial. The jury voted to convict Garcia of all counts immediately related to the murders of Amador, Alfonso, Alvaro, and Ricard: four counts of first-degree murder, one count of robbery, and two counts of unlawful possession of a firearm while engaged in a criminal offense.[5] The jury also voted to convict Garcia of all counts related to the use of Robledo's credit card: two counts of second-degree grand theft, three counts of forgery, and three counts of uttering a forged instrument.[6] The jury voted to acquit Garcia of all counts directly related to the murders of Robledo and Ledo: two counts of first-degree murder, one count of robbery, and one count of unlawful possession of a firearm while engaged in a criminal offense.[7] In the penalty phase, the jury recommended death in three of the four murder convictions (Amador, Alvaro, and Ricard), and life imprisonment on the fourth murder count (Alfonso). The trial court overrode the jury's one life recommendation and imposed four consecutive death sentences.
Garcia claims that the trial court erred in failing to grant his motions to sever the unrelated pairs of homicides and related offenses that were improperly joined in the indictment. The state argues that we should not disturb the trial court's discretion because there is a clear relationship and causal connection between all three double murders, and the temporal difference is not significant.
Our analysis must begin with the joinder and severance provisions of the Florida Rules of Criminal Procedure. Rule 3.150(a) provides:
(a) Joinder of Offenses. Two or more offenses which are triable in the same court may be charged in the same indictment or information in a separate count for each offense, when the offenses, whether felonies or misdemeanors, or both, are based on the same act or transaction or on two or more connected acts or transactions.

(Emphasis supplied.) Rule 3.152(a) provides:
(a) Severance of Offenses.
(1) In case two or more offenses are improperly charged in a single indictment or information, the defendant shall *898 have a right to a severance of the charges upon timely motion thereof.
(2) In case two or more charges of related offenses are joined in a single indictment or information, the court nevertheless shall grant a severance of charges on motion of the State or of a defendant.
(i) before trial upon a showing that such severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense, or
(ii) during trial, only with defendant's consent, upon a showing that such severance is necessary to achieve a fair determination of the defendant's guilt or innocence of each offense.
The applicable principles were made clear in Paul v. State, 385 So.2d 1371, 1372 (Fla. 1980), adopting in part 365 So.2d 1063, 1065-67 (Fla. 1st DCA 1979) (Smith, J., dissenting). The primary "purpose of requiring separate trials on unconnected charges is to assure that evidence adduced on one charge will not be misused to dispel doubts on the other, and so effect a mutual contamination of the jury's consideration of each distinct charge." 365 So.2d at 1066.
In Paul, we considered the consolidation for trial of charges related to the attempted sexual battery of three victims in three incidents. Each victim had been attacked at approximately 5 a.m.; each attack happened on a Saturday; each attack took place on an upper floor of a girl's college dormitory in Tallahassee; the assailant waited for each victim inside or in the immediate vicinity of the dormitory shower room; and the threats and actions toward each victim bore significant similarities. However, of crucial significance was the fact that the victims in crimes # 2 and # 3 were attacked within one hour of each other on one day in the same general location, whereas the victim in crime # 1 was attacked five weeks earlier in a different location. The Court held that crimes # 2 and # 3 were properly joined, but crime # 1 should have been severed.
The Court construed the "connected acts or transactions" requirement of rule 3.150 to mean that the acts joined for trial must be considered "in an episodic sense[.] [T]he rules do not warrant joinder or consolidation of criminal charges based on similar but separate episodes, separated in time, which are `connected' only by similar circumstances and the accused's alleged guilt in both or all instances." Paul, 365 So.2d at 1065-66. We reaffirmed the rationale of Paul in State v. Williams, 453 So.2d 824, 825 (Fla. 1984), where we held that the trial court erred by consolidating charges of offenses "allegedly committed on different days, not involving connected acts or transactions, but involving merely the same defendant and similar circumstances." Id. at 825. We reasoned that interests in practicality, efficiency, expense, convenience, and judicial economy, do not outweigh the defendant's right to a fair determination of guilt or innocence. Id.
This Court elaborated on these principles in Bundy v. State, 455 So.2d 330, 344-45 (Fla. 1984), cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986). Bundy involved a number of crimes committed early one morning in a sorority house, and other similar crimes committed within a matter of hours in a nearby building. The Court explained that the joinder of "connected acts or transactions" involves consideration of "the temporal and geographical association, the nature of the crimes, and the manner in which they were committed." Id. at 345. The Court held that no severance was required under those facts because
the crimes occurred within a few blocks of each other and within the space of a couple of hours. The crimes were similar in that they involved a person entering the residences of female students in an off-campus neighborhood and beating young white women with a club as they slept. Hence the criminal acts are connected by the close proximity in time and location, by their nature, and by the manner in which they were perpetrated.
Id.
We have consistently adhered to the principles enunciated in Paul, Williams, and *899 Bundy. See, e.g., Mendyk v. State, 545 So.2d 846, 849 (Fla.) (approving consolidation of an indictment for first-degree murder and an information charging two counts of sexual battery and one count of kidnapping, because all the crimes were committed upon a single victim in one continuous episode), cert. denied, ___ U.S. ___, 110 S.Ct. 520, 107 L.Ed.2d 521 (1989); Johnson v. State, 438 So.2d 774, 778 (Fla. 1983) (where taxicab driver disappeared late on January 8, and two people were abducted at 3 a.m. on January 9, there was no need to sever the offenses because "only hours separated the three homicides and related crimes"), cert. denied, 465 U.S. 1051, 104 S.Ct. 1329, 79 L.Ed.2d 724 (1984); Zeigler v. State, 402 So.2d 365, 370 (Fla. 1981) (approving consolidation of indictments charging defendant with the murder of three family members, and the murder of a fourth person in the same location on the same evening), cert. denied, 455 U.S. 1035, 102 S.Ct. 1739, 72 L.Ed.2d 153 (1982); Jacobs v. State, 396 So.2d 713, 717 (Fla. 1981) (no need to sever charges of murdering two state troopers from charge of kidnapping another person because all of the counts "arose from one continuous sequence of events"); King v. State, 390 So.2d 315, 317-18 (Fla. 1980) (approving consolidation of offenses against a work-release facility inmate who was charged by information with escape and the attempted murder of a work-release counselor, and by indictment with charges related to the murder of a woman who lived near the facility, where the crimes took place within approximately one hour), cert. denied, 450 U.S. 989, 101 S.Ct. 1529, 67 L.Ed.2d 825 (1981); Clark v. State, 379 So.2d 97, 103 (Fla. 1979) (trial court properly refused to sever extortion charge from charges of murder and kidnapping, where the defendant kidnapped a businessman, forced him to write a check on his personal account, payable to cash, and then murdered him), cert. denied, 450 U.S. 936, 101 S.Ct. 1402, 67 L.Ed.2d 371 (1981).
To summarize well-settled law, the "connected acts or transactions" requirement of rule 3.150 means that the acts joined for trial must be considered "in an episodic sense[.] [T]he rules do not warrant joinder or consolidation of criminal charges based on similar but separate episodes, separated in time, which are `connected' only by similar circumstances and the accused's alleged guilt in both or all instances." Paul, 365 So.2d at 1065-66. Courts may consider "the temporal and geographical association, the nature of the crimes, and the manner in which they were committed." Bundy, 455 So.2d at 345. However, interests in practicality, efficiency, expense, convenience, and judicial economy, do not outweigh the defendant's right to a fair determination of guilt or innocence. Williams, 453 So.2d at 825.
The record plainly shows that each pair of homicides and related offenses tried in this case involved different victims at different dates and in different places stretching across a three-month period. The first pair of murders occurred about five weeks before the second, and the second pair of murders occurred two months before the final murders. There was no temporal or geographical connection to link these crimes in an episodic sense. The only clear similarity is that they were similar types of offenses and allegedly they were committed by the same two people, either for money, drugs, or both. When we recently affirmed the convictions of Garcia's codefendant, Manuel Pardo, Jr., we described these same crimes as follows:

[E]ach of the episodes of killing was singular, discrete, and only tenuously related, if at all, to the other episodes. The first two murders took place on January 22, 1986, and purportedly involved a drug "rip-off." The next episode occurred January 28; the victim was the man who had made Pardo's silencer and who supposedly was an informant.[[8]] The third episode, on February 27, was another probable drug rip-off. The fourth, on April 22, involved two women acquaintances who had angered Pardo and his accomplice. The final one was on April 23, the victims being an alleged *900 drug dealer (Pardo's alleged boss) and his woman companion.
Pardo v. State, 563 So.2d 77, 80-81 (Fla. 1990) (emphasis supplied).[9]
Nonetheless, the state argues that the offenses were sufficiently connected to satisfy the joinder and severance rules because each was linked to one of the victims, Ramon Alvaro, a.k.a. El Negro, a drug kingpin for whom Garcia and Pardo allegedly performed various drug-related crimes. The state relies on the testimony of Garcia's associate, Carlo Ribera, to claim that all of the offenses were causally related to Alvaro. Ribera testified that at some point early in 1986, he drove with Pardo and Garcia to a meeting they had with Alvaro. Ribera waited alone in a car during the meeting. When they returned, Ribera said,
... . Rolando got off, Manuel Pardo got off and they got in my car and they were very upset, really upset.
Q [BY STATE] Did they tell you why they were so upset?
A I  they didn't tell me right then and there the reason behind it.
They just said that  Manuel Pardo said that he didn't think the deal was going to go on, that he didn't believe, after all he did for El Negro, that this guy was going to screw him, after all he had done for him.
And then Rolando Garcia told Manuel Pardo to take it easy, to calm down, that things were going to work out.
And that's when we got on the Palmetto and started driving toward Pardo's house.
Q Was there any more discussion about El Negro?
A As we were getting off, Pardo is still real upset. He drank two valiums in the car and just, if he didn't deliver he was going to kill El Negro because he wasn't goint [sic] to let this guy get away with what he was doing after all he had done for him.
That's when Rolando got a beep and he referred to Fara calling him and all the eight digits, and I asked what the 8 meant.
He said in lottery it means death.
That's when Rolando blew up and said people weren't respecting them in the drug business any more and he couldn't believe what was going on.
... .
Q ... . Was there another time, any time, when the defendant explained to you why he and Pardo were so mad about El Negro?
A When I dropped Pardo off that  Rolando got in my car, I asked why he is upset and he goes, "The reason why El Negro is upset is because we ripped off two of his customers and that was Mario and Luis Robledo and El Negro didn't want any more dealings with him."[10]
For purposes of clarity, we shall discuss the evidence and the state's theory in terms of three episodes of murder and the related crimes for which Garcia stood trial in this case.
(1) Amador and Alfonso, January 22:[11] The state contends that Alvaro instructed Garcia and Pardo to buy drugs from Amador, but that Garcia and Pardo instead killed Amador, stole the drugs, and killed Alfonso because he witnessed Amador's murder. However, contrary to the state's assertion, there was no evidence that Alvaro instructed Garcia to go to or buy drugs from Amador, or that the murders were in any way causally connected to Alvaro. The only evidence offered by the state in support of its position was Ribera's testimony, the most revealing portion of which is quoted above.
(2) Robledo and Ledo, February 27:[12] As with Amador, the state again appears to baldly assert that Alvaro told Garcia and *901 Pardo to buy drugs from Robledo, but Garcia and Pardo instead robbed and killed Robledo, and then killed Ledo because he may have witnessed the slaying. Once again the record is devoid of support for this proposition. The only evidence of a possible connection to Alvaro is the testimony of Ribera, to which we referred above.
(3) Alvaro and Ricard, April 23:[13] The state alleges that Garcia and Pardo robbed and killed Alvaro because he refused to set up a drug deal for them, and Ricard, because she witnessed the Alvaro murder. We can see no connection between these reasons and the other murders. The mere fact that Alvaro had been buying drugs from the other victims does not link all of the offenses together within the meaning of rules 3.150(a) and 3.152(a).
Based on the evidence in the record, we conclude that combining the effect of the allegations and evidence of the number and nature of these crimes did not "promote a fair determination of the defendant's guilt or innocence of each offense." Fla.R. Crim.P. 3.152(a)(2)(i); see also Paul, 365 So.2d at 1066. We also note the difficulty that trying these combined charges must present to a jury. The record shows that a prior attempt to try Garcia for these crimes resulted in a mistrial because that jury was unable to agree on a verdict after asking the court twenty-one questions during deliberations.
The trial court abused its discretion by misapplying the joinder and severance rules to deny Garcia's timely motion for severance. As we said about the same murders in Pardo, "each of the episodes of killing was singular, discrete, and only tenuously related, if at all, to the other episodes." Pardo, 563 So.2d at 80. There is no causal connection between these criminal episodes, and the tenuous link between these crimes and Alvaro falls far short of the requirements set forth in Paul, Williams, Bundy, and the other cases cited herein.[14]
We must not allow our revulsion over this series of crimes, nor our interests in practicality, efficiency, expense, convenience, and judicial economy, to outweigh our constitutional obligation to provide the defendant a fair trial. See, e.g., Williams, 453 So.2d at 825 (burglary and theft charges severed); Paul, 385 So.2d at 1372 (attempted sexual battery charges severed); Wallis v. State, 548 So.2d 808, 809 (Fla. 5th DCA 1989) (severance required in a multi-count case of sexual battery upon three children under the age of twelve); Jones v. State, 497 So.2d 1268, 1272 (Fla. 3rd DCA 1986) (kidnapping, robbery and murder charges severed), review denied, 506 So.2d 1043 (Fla.), and cert. denied, 484 U.S. 823, 108 S.Ct. 87, 98 L.Ed.2d 48 (1987); Puhl v. State, 426 So.2d 1226, 1227 (Fla. 4th DCA 1983) (kidnapping and other charges severed).
Because the discussion above disposes of this case, we do not address any of Garcia's other arguments presented on appeal. We reverse the convictions, vacate the sentences of death, and remand to the circuit court. Upon remand, the court is instructed to sever the episodes of offenses and conduct further proceedings in a manner consistent with this opinion.
It is so ordered.
*902 SHAW, C.J., and OVERTON, McDONALD, EHRLICH, GRIMES and KOGAN, JJ., concur.
NOTES
[1] We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
[2] The indictment charged Garcia with the following crimes:

I. First-degree murder (Amador);
II. First-degree murder (Alfonso);
III. Robbery (Amador);
IV. Unlawful possession of a firearm while engaged in a criminal offense (Amador and Alfonso);
V. First-degree murder (Robledo);
VI. First-degree murder (Ledo);
VII. Robbery (Robledo);
VIII. Unlawful possession of a firearm while engaged in a criminal offense (Robledo and Ledo);
IX. First-degree murder (Musa);
X. First-degree murder (Quintero);
XI. Robbery (Musa);
XII. Robbery (Quintero);
XIII. Unlawful possession of a firearm while engaged in a criminal offense (Musa and Quintero);
XIV. First-degree murder (Alvaro);
XV. First-degree murder (Ricard);
XVI. Unlawful possession of a firearm while engaged in a criminal offense (Alvaro and Ricard);
XVII. Forgery (using Robledo's credit card to buy a VCR);
XVIII. Uttering a forged instrument (using Robledo's credit card to buy a VCR);
XIX. Grand theft (VCR);
XX. Forgery (using Robledo's credit card to buy car stereo and speakers);
XXI. Uttering a forged instrument (using Robledo's credit card to buy car stereo and speakers);
XXII. Grand theft (car stereo and speakers);
XXIII. Forgery (using Robledo's credit card to rent a motel room);
XXIV. Uttering a forged instrument (using Robledo's credit card to rent a motel room).
[3] Garcia was charged in the indictment along with codefendant Manuel Pardo, Jr. Pardo was tried separately and convicted of nine counts of first-degree murder and related charges, and was sentenced to death on each murder count. We affirmed. Pardo v. State, 563 So.2d 77 (Fla. 1990).
[4] Counts IX-XIII.
[5] Counts I-IV; XIV-XVI. The trial judge rejected the jury's guilty verdicts on the two counts of unlawful possession of a firearm while engaged in a criminal offense, ordering judgments of acquittal on counts IV and XVI.
[6] Counts XVII-XXIV.
[7] Counts V-VIII.
[8] That murder was not involved in the instant case against Garcia.
[9] Pardo did not raise a severance issue in his appeal.
[10] All other references by Ribera were essentially the same. No other testimony in the record explains Alvaro's role beyond the passage quoted above.
[11] Counts I-IV.
[12] Counts V-VIII.
[13] Counts XIV-XVI.
[14] On remand, the trial court shall sever the episodes of murder and the credit card counts for which Garcia was convicted: Counts I-III (Amador and Alfonso); Counts XIV-XV (Alvaro and Ricard); Counts XVII-XIX (the VCR); Counts XX-XXII (the car stereo and speakers); and Counts XXIII-XXIV (the motel). The credit card counts are three separate episodes within the meaning of the severance and joinder rules. The fact that the same credit card was used in each episode is an insufficient basis to join the offenses, since each episode occurred in different places, at different times, and involved different victims. See, e.g., Jones v. State, 497 So.2d 1268, 1272 (Fla. 3rd DCA 1986) (severance mandated where the only connection between an episode of kidnapping and robbery of one victim at 6 p.m., and the robbery and murder of a second victim three hours later, was the defendant's use of the car he stole in the first episode to commit the acts in the second episode), review denied, 506 So.2d 1043 (Fla.), and cert. denied, 484 U.S. 823, 108 S.Ct. 87, 98 L.Ed.2d 48 (1987); Puhl v. State, 426 So.2d 1226, 1227 (Fla. 4th DCA 1983) (defendant's use of the same handgun to commit separate offenses upon different victims within a two-and-one-half-hour period was insufficient basis to join offenses).